# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Sheila Denise Piddock,

                    Plaintiff,          Case No. 22-10715

v.                                       Judith E. Levy
                                         United States District Judge
Community Living Network,

                    Defendant.           Mag. Judge Curtis Ivy, Jr.

_____/

# OPINION AND ORDER GRANTING DEFENDANT COMMUNITY LIVING NETWORK'S MOTION FOR SUMMARY JUDGMENT [32]

Plaintiff Sheila Denise Piddock brings suit against Defendant Community Living Network ("CLN") under the Fair Labor Standards Act ("FLSA"). Before the Court is Defendant's motion for summary judgment. (ECF No. 32.) The motion is fully briefed. (ECF Nos. 34, 35.) On December 5, 2024, an in-person hearing was held, and oral argument was heard on Defendant's motion.

For the reasons set forth below, Defendant's motion for summary judgment is granted.

## I.    Background

Plaintiff has two sons with developmental disabilities who were enrolled in "self-directed" Medicaid services. Those who use "self-directed" Medicaid services are able to choose the individuals who provide them with care,[1] and these caregivers are paid with Medicaid funds. (ECF No. 32, PageID.1348–1349; ECF No. 34, PageID.1906–1907.)

When an individual who needs care (a "care recipient") enrolls in "self-directed" Medicaid services, they (and their guardian, when applicable) meet with their local Community Mental Health ("CMH") agency.[2] At this meeting, they develop an "individualized plan of service" ("Plan"), which addresses the care recipient's individual needs. They then create a budget made up of Medicaid funds for the care recipient based on their Plan. (ECF No. 34-2, PageID.1936, 1943–1944, 1955, 1974; ECF No. 34-3, PageID.1980.) For the caregiver to be paid with Medicaid funds, the care recipient must work with a "fiscal intermediary" or "fiscal management entity," which is a nonprofit that contracts with their CMH

---

[1] If a care recipient has a guardian, that guardian makes decisions regarding the recipient's self-directed Medicaid services.

[2] A CMH is a county-based government agency.

2

to be "the fiduciary for drawing down Medicaid funds and paying out payroll" to their caregivers. (ECF No. 34-2, PageID.1934, 1944, 1955; ECF No. 34-9, PageID.2147.)

Lifeways is the CMH agency for Jackson County, Michigan. (ECF No. 34-5, PageID.1841; ECF No. 34-2, PageID.1936.) For the relevant time, Lifeways has only contracted with a single Fiscal Intermediary: Defendant Community Living Network. This means that Lifeways care recipients who used self-directed Medicaid services were required to use Defendant as their fiscal intermediary. (*Id.*)

After Lifeways establishes a care recipient's Plan and budget, Defendant meets with the care recipient (or their guardian) and they complete a "wage worksheet" together to determine the caregiver's hours and wages based on the care recipient's Medicaid budget and applicable wage and overtime laws. (ECF No. 34-9, PageID.2149; ECF No. 34-2, PageID.1947.) Defendant tracks and reports training that caregivers are required to complete under Medicaid, maintains HR records of caregivers, conducts an annual criminal background check on caregivers, and prepares and issues paychecks. (ECF No. 34-3, PageID.1978–1979, 1981, 1988, 1990, 1994; ECF No. 34-6, PageID.2111; ECF No. 34-9,

3

PageID.2149.) Defendant does not provide training, does not supervise caregivers on-site, and does not discipline caregivers. (ECF No. 34-2, PageID.1951–1952; ECF No. 34-3, PageID.1985, 1992; ECF No. 32-4, PageID.1853–1854.)

Here, Plaintiff was a caregiver to her sons Martin and Matthew, and was paid for her caregiving with Medicaid funds through this program. (ECF No. 32-4, PageID.1835.) Plaintiff claims that Defendant was her employer and violated the FLSA because it failed to pay her overtime wages between December 16, 2019 and August 15, 2022. (ECF No. 34, PageID.1903 (citing ECF No. 34-5).) Defendant responds that it is not liable for the failure to pay overtime wages because it is not an employer under the FLSA.

## II. Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all

facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III. Analysis

Plaintiff brings one count, alleging that Defendant violated the FLSA when it failed to "compensate Plaintiff[] at time-and-one-half times [her] regular rate for any hours worked over forty (40) hours in a workweek." (ECF No. 3, PageID.23–24.) The sole dispute in Defendant's motion for summary judgment is whether Defendant is an "employer" pursuant to the FLSA and, thus, can be held liable for violations of the FLSA.[3]

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."

---

[3] Plaintiff believes Defendant is a "joint" or "third-party" employer. (ECF No. 34, PageID.1916–1917 ("The ultimate issue in this matter is whether Defendant is Plaintiff's third-party employer such that, pursuant to the Home Care Final Rule, it cannot assert the companionship exception under the FLSA . . . .").) Meanwhile, Defendant argues it is not an employer at all and denies that it has ever "asserted it is exempt from paying overtime under the 'companionship exception.'" (ECF No. 35, PageID.2186; ECF No. 32, PageID.1354–1355.) The Court clarifies that it need not address whether Defendant violated the Home Care Rule and limits its analysis to whether Defendant is an employer pursuant to the economic reality test.

29 U.S.C. § 203(d). "While the [FLSA] does define the terms 'employee,' 'employer,' and 'employ,' the definitions are exceedingly broad and generally unhelpful." *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (citations omitted). Courts in the Sixth Circuit use the "economic reality" test to determine whether the relationship between the parties "is one of employment or something else." *Id.* (citing *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)); *see also Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019) ("To determine whether a worker fits within this expansive definition, we must look to see whether [the] worker, even when labeled as an 'independent contractor,' is, as a matter of 'economic reality,' an employee.").[4]

---

[4] To the extent Defendant argues that the Court's prior decision denying Plaintiff's renewed motion for court-facilitated notice indicates that Defendant's motion for summary judgment should also be granted (ECF No. 32, PageID.1354; ECF No. 35, PageID.2182–2183), the Court disagrees. Courts review motions for court-facilitated notice under a "strong likelihood" standard akin to that of a motion for preliminary injunction. (ECF No. 31, PageID.1330 (citing *Clark v. A&L Homecare & Training Center, LLC*, 68 F.4th 1003, 1011 (6th Cir. 2023)).) The standard for court-facilitated notice "requires a showing greater than the one necessary to create a genuine issue of fact," which is the standard used for summary judgment. *Clark*, 68 F.4th at 1011; *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (noting that "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion" because granting a preliminary injunction is an "extraordinary remedy" that should only be applied in "limited circumstances" that clearly demand it). Further, the

The economic reality test consists of six factors:

1) the permanency of the relationship between the parties;

2) the degree of skill required for the rendering of the services;

3) the worker's investment in equipment or materials for the task;

4) the worker's opportunity for profit or loss, depending upon his skill;

5) the degree of the alleged employer's right to control the manner in which the work is performed . . . ; and

6) whether the service rendered is an integral part of the alleged employer's business.

*Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 783 (E.D. Mich. 2021) (citing *Acosta*, 915 F.3d at 1055). The Court may "also consider[] whether the business had 'authority to hire or fire the plaintiff,' and whether the defendant-company 'maintains the plaintiff's employment records.'" *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) (quoting *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012)). "None of these factors is determinative on its own, and each must be considered 'with an eye toward the ultimate question—[the worker's] economic dependence on or independence from'

---

Court's order denying Plaintiff's motion for court-facilitated notice explicitly declined to decide whether Defendant is an employer. (ECF No. 31, PageID.1328.)

7

the alleged employer." *Acosta*, 915 F.3d at 1055 (quoting *Keller*, 781 F.3d at 807).

Generally, whether the parties have an employer/employee relationship is a question of law, not fact. *Werner v. Bell Fam. Med. Ctr., Inc.*, 529 F. App'x 541, 543 (6th Cir. 2013). However, the Sixth Circuit has "not demanded rigid adherence to this practice" because "material factual disputes regarding employment status may require resolution by a factfinder in close cases" due to the "fact-intensive nature" of the economic reality test. *Id.* A court can deny summary judgment because of underlying disputes of material fact, but also in close cases, i.e., when the factors provide "mixed results" such that factfinding is necessary to determine the "appropriate weight of the factors." *Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27 (6th Cir. 1998) (table opinion).

As an initial matter, the Court will not consider two factors in its analysis—the degree of skill required, and the worker's opportunity for profit or loss—because these factors focus on the worker's level of autonomy and not whether Defendant or another entity is their employer. Defendant does not suggest that Plaintiff is an independent contractor; instead, it believes Plaintiff's employer is the "employer of

record," i.e., the care recipients and/or the recipients' guardians. (*See* ECF No. 32, PageID.1357.) Meanwhile, Plaintiff argues that Defendant employs Plaintiff (jointly or solely).

With regard to the degree of skill required, courts consider "the worker's skillset in relation to the task being performed." *Reyes-Trujillo*, 513 F. Supp. 3d at 784 (citing *Acosta*, 915 F.3d at 1055). If the task requires "specialized skills or advanced training," this factor weighs in favor of the worker being *an* employee, but not necessarily that the worker is *Defendant's* employee.[5]

Similarly, evaluating the caregiver's opportunity for profit or loss does not help the Court understand whether Defendant is Plaintiff's employer. "Courts evaluate this factor by asking if workers 'could exercise or hone their managerial skill to increase their pay.'" *Acosta*, 915

---

[5] Further, caregivers like Plaintiff perform a wide variety of tasks. As described by Katherine Grant, the executive director of Defendant, "[n]o two [recipients] want[] it the same way." (ECF No. 34-2, PageID.1937.) "Services are customized to the individual receiving care." (*Id.* at PageID.1951.) The caregivers "engage[] the [recipient] in social, physical, and mental activities," which could range from reading to them, games and crafts, accompanying them on walks or errands, dressing them, helping them manage their finances, bathing and feeding them, and "monitoring the person's safety or wellbeing." (*Id.* at PageID.1937–1938.) Each caregiver's tasks are different; as a result, the degree of skill required for a caregiver depends on their care recipient.

F.3d at 1059 (quoting *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 307 (4th Cir. 2006)). Here, a caregiver's skill does not give them an opportunity for more pay from Defendant. Defendant only pays caregivers according to the amount of time spent working and according to that specific recipient's budget, which is set by the CMH. (*See* ECF No. 34-2, PageID.1954.) Thus, this factor weighs in favor of Plaintiff being *an* employee, but not necessarily that she is *Defendant*'s employee because this factor speaks only to Plaintiff's level of autonomy, not her relationship with Defendant.

For these reasons, the Court will not consider these two factors in its analysis. *See Compton v. DuPage Cnty. Health Dep't*, 426 F. Supp. 3d 539, 548–49 (N.D. Ill. 2019) (determining that "opportunity for profit or loss" and "whether the service rendered requires a special skill" are not applicable to its analysis).

## A.    Permanency of the relationship

With regard to the permanency of the relationship, courts consider "the length and regularity of the working relationship between the parties." *Keller*, 781 F.3d at 807. "[E]ven short, exclusive relationships between the worker and the company may be indicative of an employee-

employer relationship." *Id*. An "employee" generally "works for only one employer and such relationship is continuous and indefinite in duration." *Id*.

Defendant argues that this factor weighs in its favor because Plaintiff could continue her caregiving, but be paid in a different fashion, such as directly from the care recipient or by using another approved fiscal intermediary. (ECF No. 32, PageID.1356.) Alternatively, Lifeways could terminate its contract with Defendant and use another fiscal intermediary without any break in Plaintiff's work or pay. (*Id*.) For example, when Plaintiff began providing care, the fiscal intermediary was "GuardianTrac," not Defendant. (ECF No. 32-4, PageID.1839.)

The Court finds that Plaintiff's relationship with Defendant was sufficiently permanent. "[W]orkers have been deemed employees where the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative." *Keller*, 781 F.3d at 808 (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060–61 (2d Cir. 1988)); *see also Dep't of Lab. v. Americare Healthcare Servs., LLC*, 762 F. Supp. 3d 666, 680 (S.D. Ohio 2025). Here, changes in the fiscal intermediary have nothing to do with Plaintiff's own "business

initiative." However, Plaintiff's "permanent" relationship with Defendant is due to reasons outside either party's control: Lifeway's decision not to contract with an additional fiscal intermediary. (ECF No. 34-3, PageID.1997.) If Lifeways decided to contract with a different fiscal intermediary, Plaintiff's relationship with Defendant would not be permanent. The Court therefore finds that this factor weighs in favor of Plaintiff but is not particularly probative.

### B.    Worker's investment in equipment or materials for the task

This factor considers whether the caregiver or Defendant invests in equipment or materials required by the caregiver to complete their tasks. *Reyes-Trujillo*, 513 F. Supp. 3d at 785 (citing *Acosta*, 915 F.3d at 1056).

At oral argument, Plaintiff agreed that this factor does not favor her. Based on the parties' representations,[6] the Court also agrees that this factor favors Defendant because it does not provide any materials or equipment to either the caregiver or the care recipient.

---

[6] The parties do not present evidence regarding who provides materials or equipment, and the Court was unable to locate any such evidence.

## C.    Right to control

This factor considers "the degree of control the putative employer may exercise over the workers." *Reyes-Trujillo*, 513 F. Supp. 3d at 786 (citing *Acosta*, 915 F.3d at 1060).[7] "To guide this evaluation, [the court] ask[s] whether the company 'retains the right to dictate the manner' of the worker's performance." *Acosta*, 915 F.3d at 1060. (quoting *Brandel*, 736 F.2d at 1119). However, "'[t]he absence of need to control should not be confused with the absence of right to control,' and the actual exercise of control 'requires only such supervision as the nature of the work requires.'" *Id*. at 1061 (alteration in original) (quoting *Peno Trucking, Inc. v. Comm'r of Internal Revenue*, 296 F. App'x 449, 456 (6th Cir. 2008)).

This factor weighs in Defendant's favor. It is undisputed that Defendant does not supervise caregivers on-site, provide training, or discipline them. (ECF No. 34-3, PageID.1985; *id.* at PageID.1992 ("We don't critique them. We don't get feedback on them."); ECF No. 34-2, PageID.1951–1952 (stating if a caregiver was inappropriately being paid for unapproved services, it is the responsibility of the CMH, not

---

[7] The Court may "also consider[] whether the business had 'authority to hire or fire the plaintiff.'" *Keller*, 781 F.3d at 807 (quoting *Ellington*, 689 F.3d at 555). The Court will consider that dispute here.

13

Defendant, to visit the home and verify the caregiver's activities); ECF No. 32-4, PageID.1853–1854.) It is also undisputed that Defendant does not play a role in determining a care recipient's IPOS or the scope of services required or provided. (ECF No. 34-3, PageID.1980; ECF No. 34-2, PageID.1955.) These characteristics weigh heavily in favor of Defendant not having a right to control the caregiver's performance. *See Compton*, 426 F. Supp. 3d at 547–48 (discussing that the defendant did not train the plaintiff, dictate how she was to do her job, or instruct her on what tasks to perform).

Plaintiff argues that Defendant's role in ensuring that some Medicaid requirements are met demonstrates a "right to control." Plaintiff references Defendant's issuance of a start date for a new caregiver once "[a]ll [M]edicaid requirements have been satisfied," and that Defendant has some authority to stop paying a caregiver under certain circumstances — i.e., if the individual fails their annual background check and cannot meet Medicaid requirements — which practically amounts to "firing" them. (*See* ECF No. 34, PageID.1911, 1919; *id.* at PageID.1912–1913 (arguing that Defendant can "effectively end[] the employment of a [caregiver]" when there is a funding deficit in

14

a care recipient's Medicaid budget); ECF No. 34-3, PageID.1985.) The Court finds that these facts do not indicate a "right to control." Instead, the scope of Defendant's authority appears to be entirely dictated by Medicaid requirements.

For example, Defendant cannot "fire" a caregiver for any reason other than due to Medicaid requirements. Defendant's role appears to be "qualitatively different from the control exercised by an employer," who may hire or fire for any multitude of reasons. *See, e.g.*, *Zampos v. W & E Commc'ns, Inc.*, 970 F. Supp. 2d 794, 803 (N.D. Ill. 2013) (finding that hiring and firing "only in the context of quality control, safety, and security" is "qualitatively different" from an employer's role in hiring and firing). Further, there is no evidence in the record that Defendant itself hires caregivers, because it does not solicit or select them. (ECF No. 34-3, PageID.1992 ("[W]e don't hire them. We don't fire them."); ECF No. 34-2, PageID.1947–1948 (stating that Defendant "gives some advice [to care recipients] on how to advertise" to potential caregivers).)

Plaintiff also argues that Defendant has control over the caregiver's work schedules. According to Melissa Frash, Defendant's director of fiscal intermediary services, Defendant may suggest what days a caregiver

could work, but Defendant does not actually schedule them. (ECF No. 34-3, PageID.2003[8]; *id.* at PageID.1992.) Although Plaintiff argues that Defendant's "suggestion" of a workweek schedule is indicative of its control over caregivers such as Plaintiff (*see* ECF No. 34, PageID.1919), the Court declines to consider a suggestion of a workweek schedule as dictating the manner of a caregiver's performance. Plaintiff has not identified record evidence demonstrating a greater level of control over the caregivers' schedules such that the Court could find that Defendant's suggestions are so meaningful to be requirements. *See Peel v. Palco, Inc.*, No. 4:19-CV-00795-BSM, 2022 WL 320933, at *3 (E.D. Ark. Feb. 2, 2022) (finding that the defendant, a "fiscal agent" for home caregivers, did not

---

[8] This portion of the deposition states:
Q: CLN at least gives the suggestion to have the workweek be Sunday to Saturday, correct?
A: We suggest it.
Q: So you at least influence perhaps the workweek schedule for [care recipients], correct?
A: We inform them they could have one set.
Q: And you suggest days, correct?
A: Yeah, suggest –
Q: Sunday to Saturday, right?
A: -- uh-huh.
(ECF No. 34-3, PageID.2003.)

control their schedules when it "did not direct the specific days, or times of day, any caregiver was to work").

Defendant's role in setting wages for caregivers also does not demonstrates a right to control. Plaintiff states, "Defendant advises [care recipients]/guardians on how to set wages for [caregivers] based on the Medicaid funds allocated in IPOS budgets," "orders [care recipients]/guardians that they 'need' to reduce wages when the IPOS budget cannot handle the number of overtime hours a [caregiver] works," and "contacts [caregivers] directly to inform them of changes in payrates." (ECF No. 34, PageID.1912–1914.) The record reflects that Defendant certainly assists or advises recipients on caregiver wages. (ECF No. 34-2, PageID.1947.) According to Melissa Frash, Defendant holds a meeting with the recipient (or guardian) and fills out a wage worksheet with them "based on the budget from CMH." (ECF No. 34-3, PageID.1996.) In short, the recipient receives a budget of Medicaid funds from CMH, and, with Defendant, the recipient calculates the wages they can pay their caregivers based on that amount of money allocated by Medicaid and relevant minimum wage and overtime laws. (*Id.*)

17

Plaintiff appears to argue that Defendant's role in setting wages rises above an advisory role. As evidence of this heightened role, Plaintiff points to emails between Melissa Frash and recipients or guardians. Plaintiff argues that these emails, viewed in the light most favorable to her, "raises an inference that Defendant sets the wages of [caregivers] and audits their timesheets." (ECF No. 34, PageID.1924.)

In the first email, Frash writes, "we need to reduce the wage to [] $11.19/hr until the budget comes into balance then we can increase it. Starting Dec 1st Cyndi's wage will be $11.19 an hour. If you find another employee or Cyndi stops doing overtime the wage can go higher." (ECF No. 34-13, PageID.2171.) However, a review of the full email exchange does not demonstrate that Defendant has an "employer's" level of control over the caregiver. Frash asks if the guardian could hire another person to reduce overtime pay. (*Id.* at PageID.2172.) Further, Frash presents pay options to the guardian based on their budget and states, "[l]et me know what you prefer and it will be effective 11/1/2020." (*Id.*) The full email exchange does not demonstrate that Defendant has full control over the wage, but, instead, suggests that Defendant "advises [recipients]/guardians on how to set wages." (ECF No. 34, PageID.1919.)

In the other email, Frash writes, "[e]ffective Jan 16th your wage will be reduced by $3 and Nekiesha by 25 cents. There is no PTO or holiday pay until the budget is balanced. If these reductions don't balance out the budget, more wage decreases will need to be done." (ECF No. 34-14, PageID.2177.) According to Frash's deposition testimony, in this email, Defendant "reduced the wage" of two providers, Octavia and Nekiesha, "[b]ased on [that recipient's] budget." (ECF No. 34-3, PageID.2009.) Frash explains that Octavia and Nekiesha's recipient "basically gave us permission to do what we need to do to keep her in budget" and, as such, Octavia and Nekiesha's wages were reduced. (*Id.*)

This email does not demonstrate that Defendant itself sets the wages of the care providers. While the record reflects that Defendant received authority from Octavia and Nekiesha's care recipient to set their wages, there is no indication that Defendant generally received this authority from all recipients or their guardians to set care providers' wages. As evidenced in the other email submitted by Plaintiff, Defendant does not have that authority universally. (*See* ECF No. 34-13.) Additionally, Plaintiff does not point to record evidence that *Plaintiff's* recipients or guardian gave permission to Defendant to set her wages.

The Court declines to find that Defendant generally sets wages for care providers or set Plaintiff's wages.

Plaintiff includes an additional email in her response to Defendants' supplemental brief, arguing that it represents another "instance . . . where Defendant facilitated the reduction in wages for [caregivers]—including Plaintiff." (ECF No. 39, PageID.2207; ECF No. 39-1.) The Court is concerned that this exhibit unfairly raises new facts at a very late stage of the briefing. The Sixth Circuit explains, "where a non-movant advances factual allegations in her response to a motion for summary judgment that the movant has not previously been afforded an opportunity to address," the court should permit a reply brief. *Matthews v. Wells Fargo Bank*, 536 F. App'x 577, 579 (6th Cir. 2013) (citing *Peters v. Lincoln Electric Company*, 285 F.3d 456, 476 (6th Cir. 2002)). Here, Defendant received no opportunity to address Plaintiff's new exhibits. Meanwhile, Plaintiff had an opportunity to present this evidence in her response to Defendant's motion for summary judgment, but did not do so.

However, if the Court considers this exhibit in the light most favorable to Plaintiff, it still does not demonstrate Defendant's control over wages. The exhibit is an email from Sam Brown, a "fiscal

intermediary coordinator" for Defendant, to Stephanie Justice and David Lowe, whose roles have not been explained to the Court. (ECF No. 39, PageID.2207.) In the email, Brown lists dollar amounts between $3.62 to $5.07, which are "rates in LEO," asks Justice to "confirm that these are correct," and then asks if they "MUST reduce staff wages to match?" (*Id.*) Based on Brown's deposition, the "rates" are the amounts Defendant bills CMH for "the dollar that we spent." (ECF No. 39-2, PageID.2216.) Brown explains that, in his email, he believed Defendant was "paying out more than what we're getting reimbursed for" and that the budgets for those recipients (which includes Plaintiff's sons, Matthew and Martin) were "in a deficit." (*Id.* at PageID.2216–2217.)

This email exchange does not demonstrate Defendant's control over Plaintiff's wages. Lowe's reply to Brown expresses confusion. (ECF No. 39-1, PageID.2212 ("Sam, why are we needing to reduce pay? . . . What exactly is the issue with pay?").) Additionally, it is not clear if any actions were taken in response to Brown's email. Brown's deposition testimony reflects that his role is very limited; he stated that he "just process[es] the payroll as it comes in from the department" and that issues regarding wages are "above me" and "goes to the director of CMH for discussion."

21

(ECF No. 39-2, PageID.2217.) As such, the Court is unable to conclude that Brown's email demonstrates anything about Defendant's process and procedures regarding wages that would suggest that Defendant employs Plaintiff.

In short, the Court finds that this factor, overall, favors Defendant.

### D. Services rendered are integral to Defendant's business

This factor considers whether the caregivers' services are "integral" to Defendant's business. "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Keller*, 781 F.3d at 815; *see also Acosta*, 915 F.3d at 1055 (explaining that this factor favors an employer relationship when the defendant "could not function without the services its workers provide").

Plaintiff avers that Defendant is reliant on the existence of care providers because "it cannot collect a monthly flat fee for servicing consumers without a DCS." (ECF No. 34, PageID.1920.) In contrast, Defendant believes this factor does not favor Plaintiff because "the nature and amount of the 'service[s] rendered' by each [care provider] *has*

*no bearing* on CLN's 'business' (i.e. non-profit mission) or funding." (ECF No. 32, PageID.1360.)

The Court finds that this factor weighs in favor of Defendant. While Defendant relies on the *existence* of care providers, it does not rely on the provider's *services* in its day-to-day functioning. For example, the quality of a care provider's effort does not impact Defendant's business, as long as they meet basic Medicaid requirements like a criminal background check. Defendant's function is to facilitate Medicaid payments and other requirements for recipients using self-directed Medicaid services, not to supply care providers. *See Acosta*, 915 F.3d at 1055 (citing *Schultz*, 466 F.3d at 309).

Drawing all inferences in favor of Plaintiff, Defendant's monthly fee received from Lifeways is dependent on both the number of recipients and the number of care providers that recipient has. (ECF No. 34-2, PageID.1935.)[9] Because Defendant's revenue is generated by both

---

[9] The record reflects that some of Defendant's CMH contracts depend on both the number of recipients and the number of care providers that recipient has, and other CMH contracts pay Defendant a flat fee per recipient, no matter how many care providers the recipient has. (ECF No. 34-2, PageID.1935 (describing three of Defendant's contracts which have a "sliding fee scale"); *id.* at PageID.1958 (describing that additional care providers for a recipient would not change the amount of money received by Defendant).) It is not clear which type of contract Defendant has with

recipients and care providers, the Court concludes that this factor weighs in favor of Defendant.

### E.    Other factors

Finally, the Court "may and should look to other evidence in the record to determine whether the totality of the circumstances establishes that" Defendant employed Plaintiff. *Keller*, 781 F.3d at 815.

The Sixth Circuit has explained that the Court may consider "whether the defendant-company 'maintains the plaintiff's employment records.'" *Id.* at 807. It is undisputed that Defendant tracks and reports whether a care provider completes required training under Medicaid, maintains HR records, subjects care providers to their payroll calendar, and conducts an annual criminal background check. (ECF No. 34-3, PageID.1978–1979, 1981, 1988, 1990, 1994; ECF No. 34-6, PageID.2111.) An entity's maintenance of employee records weighs in favor of their employer status, even if they maintain these records in compliance with federal or state regulation. *Peel*, 2022 WL 320933, at *4; *see also Keller*, 781 F.3d at 807 (citing *Ellington*, 689 F.3d at 555).

---

Lifeways. Regardless, the outcome of this factor does not change, even assuming the Lifeways contract pays Defendant more for each caregiver a recipient has.

24

Plaintiff also argues that care providers are "economically dependent on Defendant" because "Defendant is responsible for paying the wages of [a provider] when a [care recipient's] IPOS budget has a deficit." (ECF No. 34, PageID.1912 (emphasis omitted).) The record reflects that when a care recipient goes "beyond the budget" set by the CMH, Defendant loses money and pays the excess from the fees Defendant obtains from the CMH it contracts with. (ECF No. 34-3, PageID.2007; ECF No. 34-2, PageID.1962.) However, the Court disagrees with Plaintiff's assessment that this demonstrates Plaintiff's "economic dependence" upon Defendant itself. Although Defendant pays the difference between a recipient's Medicaid budget and their care provider's pay, the resulting deficit is ultimately resolved through (1) reducing the care provider's wage or hours such that the deficit is made up in the future (ECF No. 34-2, PageID.1959; ECF No. 34-3, PageID.2006), (2) CMH allocating additional funds to that recipient (ECF No. 34-2, PageID.1959), or (3) Defendant servicing notice on the recipient to find another fiscal intermediary. (*Id.*) For this reason, care providers are not "economically dependent" on Defendant; instead, they are dependent on the CMH's allocation of Medicaid funds and the recipient

or their guardian's decisions regarding hours and number of care providers.

### F.    Balancing the factors

The Court concludes that Defendant is not Plaintiff's employer under the FLSA because almost all of the relevant factors weigh in favor of Defendant. Although the Court found that the "permanency of the relationship" factor slightly favored Plaintiff and that Defendant maintains Plaintiff's records, the totality of the circumstances demonstrates that Defendant did not employ Plaintiff. *See, e.g.*, *Peel*, 2022 WL 320933, at *4 (finding that the defendant's "maintenance of some employment records" cannot alone establish joint employment) (citing *Ray v. Cal. Dep't of Soc. Servs.*, No. cv-17-04239-PA, 2020 WL 6784527, at *9 (C.D. Cal. Oct 27, 2020)). The Court is sympathetic to the difficult situation faced by recipients and their caregivers in our current system where Medicaid reimbursement is so limited and may be further limited in the future. However, the Court concludes that no reasonable jury could find that Defendant is an employer under the FLSA and Defendant is entitled to summary judgment.

26

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS Defendant's

motion for summary judgment and this case is dismissed with prejudice.

IT IS SO ORDERED.

Dated: July 25, 2025                    s/Judith E. Levy
Ann Arbor, Michigan                    JUDITH E. LEVY
                                       United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 25, 2025.

                                       s/William Barkholz
                                       WILLIAM BARKHOLZ
                                       Case Manager